RECEIVED

2013 JUN 24  AM11:11

U.S. COURT OF APPEALS
FOURTH CIRCUIT

## TABLE OF CONTENTS

I.


Informal Brief — 8 pages.


Certificate Of Service — 1 page.

### EXHIBITS

Document 39, pages 8, 9  Court Order dismissing §2255 motion


Document 32, page 10  Government Supplemental Answer To Petitioner's §2255 motion


Trial Record, pages 104, 107, 108, 142, 143, 547, 548, 549, 551, 552, 553, 578, 608, 632


**\*\*\*\*\*\*\*\*\*\***

Please review how much the Court's order dismissing the §2255 motion
contradicts the trial record facts.

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

NO. 13-6878

(3:04-cr-00223-RJC-DCK-2

(3:08-cv-00219-RJC)

---

| | |
|---|---|
| MADISON DUANE MCRAE, | ) |
| Petitioner, | ) |
| PRO SE | ) |
| | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| Respondent | ) |
| | ) |

---

### INFORMAL BRIEF

<u>JURISDICTION</u> - U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA.
Petitioner is appealing the April 29, 2013, order dismissing Rule 60(b) motion as
successive (DOC. 52). No Certificate Of Appealability was granted.

### ISSUES ON APPEAL

The Court improperly construed and dismissed Petitioner's Rule 60(b) motion as a
successive § 2255 motion.

### FACTS AND SUPPORTING ARGUMENTS

The Court's decision to dismiss Petitioner's § 2255 motion was based on factual
errors and the omittance of relevant material evidence that was needed to render a
fair and accurate decision during the collateral review process. These errors left
the § 2255 proceeding flawed. Petitioner tried to get these errors corrected during
the the appeal process and certiorari. Petitioner then filed a Rule 60(b) motion to
correct these errors. The District Court arbitrarily ruled that because Petitioner's
Rule 60(b) motion attacks the decision to dismiss his § 2255 action, then the Rule
60(b) motion is automatically a successive §2255 motion attacking his criminal

1

judgement. One of the purposes of a Rule 60(b) motion is to remedy a defect in the collateral review process. This includes decisions that are based on a defective foundation. When a Court's decision is based on factually incorrect information and evidence that is relevant, material, substantive, and critical is omitted from the collateral review process, then a defect has occurred, leaving the collateral review proceeding flawed and the decision unreliable and unfair, and the integrity of Court in doubt. Petitioner is clearly only attacking the manner in which the §2255 judgement was procured, because that judgement rest on a defective foundation. There is not the slightest bit of evidence that Petitioner is attacking his conviction or his sentence. Petitioner is only seeking to correct the errors that were committed during the collateral review proceeding. **Error #1.** THe Court made a critical ruling during trial. However, during the collateral review process, the Court has mistakenly denied that it made this ruling. The Court's mistaken belief that it did not mention or make a ruling regarding trial counsel's failure to file a pre-trial motion to suppress Petitioner's statements conflicts with the record and is a obvious factual error that has flawed the collateral review proceeding. During the collateral review process, Petitioner attempted to prove that trial counsel provided ineffective assistance by failing to file a pre-trial motion to suppress Petitioner's statements. As proof, Petitioner relied on the trial Court's statement and ruling, which the Court stated, "Have you filed a motion to suppress that?" (ID. TR.TR.547) "And the Court denied that request after asking counsel whether a motion to suppress had been filed, and there had been no pre-filed motion to suppress as is required by Rule 12(b)(c), and I find that that's a waiver of a suppression hearing, the failure to file a pre-trial motion." (ID.TR.TR.632) The record clearly supports the fact that the Court did mention the absence of a pre-trial motion to suppress. Then why, during the collateral review process and during the Court's decision to dismiss Petitioner's §2255 motion does the Court deny this clear fact, when it states "In denying Counsel's motion to exclude,

2

the Court made no mention of the absence of a pre-trial motion to suppress." ? (Doc.39 pg.8) Why did the Court deny making a ruling that it clearly in fact did make?

**Error #2.** During the collateral review process the Court's decision to dismiss Petitioner's §2255 motion was based on the Court's mistaken belief that trial counsel did not also challenge the admissibility of petitioner's statements based on a Miranda violation. The record clearly shows that counsel also raised the Miranda claim and that the Court acknowledged that claim.  **COUNSEL:** "Our contention is, he never made the statements at all...There's also no waiver of rights form with regards to Mr. McRae...We would also ask for an opportunity to voir dire him, and get to the bottom of whether his rights were violated. In particular we know he was being detained at this time, but he was not given his Miranda rights." (ID.TR.104,547)

**COURT:** "I;m going to require, before you ask him anything that the defendant said to him, that you lay a foundation that includes sufficient information for the Court to determine whether there's any violation of rights." (ID.TR.547-548)

Why would the Court make this request if counsel did not raise the Miranda issue? Why during the collateral review proceeding did the Court deny that counsel raised the Miranda issue, when the trial record clearly shows that counsel did raise a Miranda claim?     **Error #3.** The Court mistakenly concluded that Petitioner 'admitted' that he knew Ms. Bailey. The Court's mistaken conclusion led to the Court's erroneous decision that Petitioner's statements were not prejudicial because he admitted he knew Ms. Bailey. The Court's decision does not account for the fact that Petitioner did not admit that he knew Ms. Bailey. The record clearly shows that Petitioner lied to federal agents and 'did not admit' that he knew Ms.Bailey. The Government presented evidence to the jury, that Petitioner lied to federal agents, denying that he knew Ms. Nailey. The Government presented this evidence through the testimony of federal agents and then again during closing arguments and rebuttal. The Government even explained to the jury why Petitioner had lied to the agents, denying that he knew Ms. Bailey.

**AGENT CRUM:** "I asked him if T-N-I-A was Atonia Bailey, and if Atonia Bailey was in Jamaica, and he said no." (ID.TR.107,108).

**GOVERNMENT:** "This particular count deals with August 24, 2004, and it deals with the fact that the defendant and Rodney Green made the girls bring the drugs back for them. The defendant purposely scheduled the girls' trip on a different day. He purposely scheduled the girls' trip to go through a different city. The defendant did not want to be anywhere near the girls and the cocaine. It was done on purpose. Because when the defendant gets stopped in Memphis he can go ahead and say 'I don't know Atonia Bailey'." (ID.TR.578)   "Madison McRae, the defendant, knew exactly what was happening in Charlotte, N.C. That's why he first said 'he didn't know Atonia Bailey'." (ID.TR. 608)   It is apparent from the record that Petitioner lied to the agents and 'did not admit that he knew Ms. Bailey', and that the Government used this lie to prove guilt, prejudicing Petitioner. During the collateral review process, Petitioner specifically argued that it was his lie to federal agents about not knowing Atonia Bailey that caused him actual prejudice. The Court completely ignored Petitioner's argument completely disregarded the facts, thus the Court never determined what prejudicial harm was caused when the jury heard that Petitioner had told lies to federal agents, or what did the lie do to Petitioner's credibility with the jury. Because that determination was never maade, a defect has occurred in the collateral review process. Why did the Court conclude that Petitioner was not prejudiced by the admittance of his statements because he knew Ms. Bailey, without acknowledging the fact that Petitioner had lied stating that he did not know Ms. Bailey ? Why are the Court's collateral review facts contradictory to the trial record ?   **Error #4.** The Court failed to consider the prejudicial impact of all of Petitioner's unwarned statements that were admitted at trial and used as evidence against Petitioner. This failure caused a defect in the collateral review proceeding because prejudicial statements that were material, probative, substantive and relevant were excluded from the prejudicial analysis process, depriving Petitioner of a fair

proceeding. The following unwarned statements that were made to federal agents, and used as evidence against Petitioner at trial, were submitted to the Court in his §2255 petition so that the Court could determine the prejudicial harm. 1) Petitioner lied to federal agents when he denied he knew Atonia Bailey. 2) He stated he saw 2 kilos of cocaine in the bungalow in Jamaica. 3) He saw Green take each girl out of the room and strap the cocaine on them. 4) He was aware the women were strapped with cocaine when they caught a cab to the airport for their return trip to the U.S. 5) Petitioner lied to federal agents denying that Atonia Bailey, Andrea Spears, or Latia Harris was with him in Jamaica, stating he only hung out with Jamaican women while in Jamaica. There were no American women with him. 6) Petitioner stated that he and Green had a plan in place that would allow them to bypass Customs with the help of a female customs agent, who Green was friendly with. (ID TR.107,108,551-553,578,608)  The Court ignored and excluded every unwarned statement except statement #2 from the prejudicial analysis, and the whole collateral review process itself. The Court was required as a matter of law and fairness to determine the prejudicial harm of every statement made by Petitioner and used against Petitioner at trial. Instead, the Court decided to hand-pick certain statements that it knew were not prejudicial to Petitioner. The Court chose to analyze the statements that were exculpatory, if anything. **COURT:** "Petitioner has not established that he was prejudiced by the admission of these statements at trial. Petitioner admitted that he knew Ms. Bailey and that he had seen cocaine in the bungalow in Jamaica, but denied any connection to the cocaine smuggling, stating that it was Mr. Green's endeavor, and that he had done nothing wrong." (Doc.39 pg.9)  Other than the statement about the cocaine in the bungalow, Petitioner never claimed that these statements were prejudicial, that's why he did not raise them in his §2255, the Court did, even though they were not prejudicial. Why would the Court substitute statements that are obviously not prejudicial in place of statements that are prejudicial ? How can Petitioner's proceeding be fair with such a abusive substitution ? The Court's

decision to dismiss Petitioner's §2255 was based on the error of excluding relevant, probative, substantive, and material evidence that was critical to the collateral review proceeding, and needed to render a fair decision.    **Error #5.** The Court committed error during the process that was used to determine if Petitioner's Miranda rights were violated. The Court has ignored and excluded the facts surrounding the alleged Miranda violation, and has replaced the facts with factually incorrect information in order to reach a decision.    **COURT:** "Agent Crum testified that the Petitioner's statements were made to him during an interview with Petitioner upon his return trip to the U.S. from Jamaica and during the customs re-entry process. Prior to his interview with Agent Crum, Petitioner insisted that he was aware of his rights." (Doc.39 pg.9)    The Court's assessment of the facts is false and misleading. First, the record clearly shows that the statements were not made during the customs re-entry process, but instead were made after Petitioner was pulled away from the customs re-entry process and first placed in a locked holding cell for over an hour, and then detained in Agent Crum's office where he was not free to leave, and was not given his Miranda rights. even though he was questioned about his involvement with Ms. Bailey, the woman who had earlier been arrested for the attempted smuggling of cocaine, and who was the reason why Petitioner was being detained in the first place. **GOVERNMENT:** "Although Petitioner had been held in a holding cell pending his interview with Agent Crum, at the time of the interview, Petitioner was sitting in Agent Crum's office and was not under arrest." (ID. Doc.32 pg.10)    **Cross examination of Agent Crum –**    Q: Agent Crum, this testimony regarding the cell phone took place in your office, didn't it ?

A: It did.        Q: And at that time he wasn't free to go anywhere, was he?

A: No, not at that time.        Q: Agent Crum, are you familiar with Customs Form 4612? It's a statement of rights form.        A: Yes, I am.

Q: That's a standardized form that you in customs use when you are questioning an individual or a suspect.        A: No, sir, it's not. When we're going to place some-

body under arrest. It's the Miranda warning we give them. But Mr. McRae was not under arrest at the time.          **Q:** You never gave Mr. McRae that standardized form to waive his rights, did you?          **A:** No, sir, I did not. (ID.TR.142,143)

The record contradicts the Court's erroneous assessment of the facts. It is a clear fact that the detainment of Petitioner was not part of the customs re-entry process, so the interview of Petitioner couldn't have taken place during the customs re-entry process as the Court mistakenly believes. The Court ignored the fact that Petitioner was clearly in custody but had not been advised of his Miranda rights. Secondly, prior to the interview with Agent Crum, Petitioner never insisted that he was aware of his rights. The Court is factually wrong. It was actually prior to the interview with Agent Mensinger that Petitioner allegedly insisted he was aware of his rights, and 'after', not prior to his interview with Agent Crum. This is significant because Agent Crum was the first Agent to interview Petitioner, Agent Mensinger was the second. (ID.Tr. 549)  So by the time Petitioner had insisted to Mensiger, Agent Crum had already violated Petitioner's rights. It is obvious that the Court's decision was based on the erroneous belief that Petitioner's statements were made during the customs re-entry process and that Petitioner was not in custody at the time the statements were made. And that Petitioner insisted that he was aware of his rights before any statement was made to Agent Crum. The Court's decision was based on factual and legal errors.

**CONCLUSION**

It is obviously clear that all of the issues raised in Petitioner's Rule 60(b) motion are a attack on the errors and factually incorrect information that the Court used to procure it's decision to dismiss Petitioner's §2255 motion, and is in no way shape or form a attack on Petitioner's conviction or sentence. If the Fourth Circuit were to grant Petitioner relief on his Rule 60(b) motion, it would not alter his conviction or sentence. It would just reopen the §2255 proceeding which Petitioner is attacking, and allow the errors to be corrected, thus restoring fairness and integrity to the

collateral review proceeding. Therefor the Court has improperly construed Petitioner's Rule 60(b) motion as a successive §2255 motion. UNITED STATES v WINESTOCK, 340 F.3d 200, at 207 "A motion seeking a remedy for some defect in the collateral review process will be deemed a proper motion to reconsider. Second or successive habeas petitions are based entirely on the alleged violations of federal rights that occur during the criminal trial."

### RELIEF

Petitioner is requesting that the Fourth Circuit vacate the District Court's order dismissing Petitioner's Rule 60(b) motion so that the errors in Petitioner's §2255 may be carefully reviewed and corrected. Petitioner is not asking that the whole §2255 petition be evaluated, the Court's evaluation should be limited to the ineffective assistance Miranda claim, where the errors occurred. Petitioner is also requesting that the Fourth Circuit reassign Petitioner's case to another court.

### PRIOR APPEALS

UNITED STATES OF AMERICA  v  MADISON DUANE MCRAE    NO. 06-4606 affirmed

UNITED STATES OF AMERICA  v  MADISON DUANE MCRAE    NO. 11-6422 dismissed

UNITED STATES OF AMERICA  v  MADISON DUANE MCRAE    NO. 13-1466 pending

MADISON D. MCRAE #19852-076
Federal Correctional Institution
P.O. BOX 6001
Ashland, Kentucky 41105

*Madison McRae  6-17-2013*
MADISON MCRAE

8

## ATTACHMENT

Petitioner first sought relief from judgement March 28, 2011 when he filed his notice

of appeal (Doc.41). This was 13 days after the Court's March 15, 2011 order dismissing

Petitioner's 2255 (Doc.39). Although Petitioner did not title the motion as a Rule 59

or Rule 60(b) motion, the contents of Petitioner's appeal dictates that Petitioner

was seeking relief from the errors that were used to procure judgement,and which caused

the defect in the collateral review process, therefore the Court should gave construed

Petitioner's appeal as a 60(b) motion. There has been a longstanding practice of courts

to classify pro se pleadings from prisoners according to their contents, without regard

to their captions, Winestock, 340 F.3rd at 203 quoting United States v Emmanuel, 288 F.

3d 644, 647 (4th Cir.2002). Petitioner's petition should have been considered at the

time his appeal was filed.

_Madison McRae_ June 17-2013
MADISON MCRAE

##### ***** <u>EXHIBITS</u> *****

The Government further argues, and this Court agrees, that the evidence presented based on the information gathered from Petitioner's cell phone was insignificant in comparison with the weight and probative value of the testimony of each of the co-conspirators who accompanied Petitioner to Jamaica.[4] (Case No. 3:04cr223, Trial Transcript Vol. 1 at 151-207, 251-291; 311-357; 358-436).   Therefore, even if this Court assumes that counsel was deficient for failing to file a motion to suppress the cell phone evidence, Petitioner has not established prejudice because, based on the other evidence admitted at trial, there is no reasonable probability that the result of the trial would have been different.

      3.    <u>Failure to Move to Suppress Petitioner's Statements</u>

      Petitioner contends that his trial counsel was ineffective for failing to move to suppress his statements as having been made without having been advised of his <u>Miranda</u> rights.[5] Petitioner argues that his counsel sought to have his statements excluded at trial but did not succeed because the Court determined that Petitioner had waived his rights to challenge the admissibility of the statements by failing to file a motion to suppress.  This is incorrect.  The record establishes that during trial, counsel challenged the admissibility of Petitioner's statements claiming that Petitioner "never made [the] statements at all."  (<u>Id</u>. at 104). Government counsel noted that Petitioner had not filed a motion to suppress the statements; however, in denying counsel's motion to exclude, the Court made no mention of the absence of a pre-trial motion to suppress.  (<u>Id</u>.)

---

    [4] Indeed, the Fourth Circuit stated that there was "overwhelming evidence" of Petitioner's guilt.  <u>United States v. McRae</u>, 235 Fed. App'x 968, 970 (4th Cir. 2007).

    [5] Petitioner presents nearly identical arguments related to the admission of his statements in violation of the Fifth Amendment as to both trial counsel's performance and appellate counsel's performance.

8

With respect to whether there was a sound basis for challenging the admissibility of the statements purportedly made without Miranda warnings, Agent Crum testified that the Petitioner's statements were made to him during an interview with Petitioner upon his return to the United States from Jamaica and during the customs re-entry process.  Prior to his interview with Agent Crum, Petitioner insisted that he was aware of his rights.  (Id. at 549).  Agent Mensinger explained to Petitioner that he did not have to answer any questions, that a lawyer would be appointed to represent him if he could not retain one, and that he should not answer any questions if he could not answer them truthfully.  (Id. at 549, 554).  This is not a formal explanation of his rights pursuant to Miranda, but Petitioner was at least informed of some of his rights consistent with Miranda warnings.  But even if Petitioner was not informed of his Miranda rights, and his counsel was ineffective for failing to file a motion to suppress his statements made in violation of Miranda, Petitioner has not established that he was prejudiced by the admission of these statements at trial.  Petitioner admitted that he knew Ms. Bailey and that he had seen cocaine in the bungalow in Jamaica, but he denied any connection with the cocaine smuggling, stating that it was Mr. Green's endeavor, and that he had done nothing wrong.  (Id. at 550-53).  However, Petitioner's co-conspirators testified directly to his involvement and participation in the conspiracy, from helping to arrange the travel to taping the cocaine onto Ms. Bailey's legs before her departure from Jamaica.  (Id. at 159-164; 170-175).  As stated by the Fourth Circuit, there was overwhelming evidence of Petitioner's guilt.  McRae, 235 Fed. App'x at 970.  Petitioner has thus not established that he was prejudiced by the admission of his statements, and so his claim must fail.

4.    Failure to Object to Prior Drug Use and Transactions

Petitioner argues that his counsel was ineffective for failing to object to the

9

C.    Failure to move to suppress Petitioner's statements.[3]

Petitioner next asserts that trial counsel's performance was deficient because he should have moved to suppress statements obtained from Petitioner without Petitioner's having been advised of his *Miranda* rights. Petitioner asserts further that trial counsel sought to have these statements excluded at trial but did not succeed because the Court determined that Petitioner had waived his right to challenge the admissibility of the statements by failing to file a motion to suppress. As set forth in the Government's initial answer in this case, contrary to Petitioner's assertion about the in-trial colloquy about the statements, during the trial, Mr. McKnight challenged the admissibility of the statements primarily on the basis that Petitioner "never made [the] statements at all." (Trial Transcript at 104.) Government counsel noted that Petitioner had not filed a pre-trial motion to suppress the statements, but the Court did not mention a pre-trial motion to suppress or deny the motion to exclude the statements on the basis that the argument had not been made pre-trial.

With respect to whether there was a legally sound basis for challenging the constitutionality of the admission of the statements, Agent Crum testified that the statements made by Petitioner were in response to his interview by Agent Crum upon Petitioner's return to the United States from Jamaica and during the customs re-entry process. Although Petitioner had been held in a holding cell pending his interview with Agent Crum, at the time of the interview, Petitioner was sitting in Agent Crum's office and was not under arrest. *See United States v.*

---

[3]As with his arguments related to the seizure of his cell phone, Petitioner presents nearly identical legal arguments related to the admission of his statements in violation of the Fifth Amendment as to trial counsel's performance (Ground Three) and appellate counsel's performance (Ground Nineteen). Because of the legal argument underpinning his claims is the same, the Government responds to both together.

10

1 probably Agent Mensinger with regard to statements allegedly

2 made by Mr. McRae.  Our contention is, Your Honor, he never

3 made those statements at all.  And there's no corroborative

4 evidence to support that the statements ever took place.  To

5 the best of my knowledge there's no videotape, audiotape,

6 other than a summary of what they said happened in that

7 room.  There's also no Waiver of Rights form with regards to

8 Ms. McRae and so we'd just like a brief voir dire with

9 regard to Agent Crum.

10    THE COURT:  Sounds to me that all your objections

11 to testimony are the kind of things that you would be able

12 to do on cross, and I'll deny your motion for voir dire and

13 let you probe the truthfulness of the agent's testimony on

14 cross-examination.

15    MR. McKNIGHT:  So the Court's ruling these

16 statements would not be of the type that would need to be

17 limited by the agent or expressed by the agent.

18    THE COURT:  The Court's ruling is that whether

19 they were made or not is something that is the subject of

20 cross-examination and not subject to the necessity of a voir

21 dire examination.

22    MS. MARSTON:  There hasn't been a motion to

23 suppress, has there?

24    MR. McKNIGHT:  No.  No.  There's not been a

25 pretrial motion to suppress.  This is a motion I'm making

1   Q    What did the defendant claim that he did?

2   A    He was in real estate.

3   Q    Now, after the secondary inspection took place of both

4   Rodney Green and the defendant, what happened?

5   A    I contacted Charlotte to find out what was going on

6   with the situation with the females that had --

7   Q    And based on what you learned, what happened?

8   A    Mr. Green and Mr. McRae were placed under arrest.

9   Q    At any point did you forward anything to Charlotte to

10  help them with their investigation here with the three

11  females they had detained?

12  A    Yes, I did.

13  Q    What did you forward?

14  A    We forwarded pictures of Mr. McRae, Mr. Green, as well

15  as miscellaneous documents, cellular telephones and other

16  items found on the possession of Mr. McRae and Mr. Green.

17  Q    Okay.  Before the defendant was placed under arrest,

18  had you asked to look at any items that were in his

19  possession that happened, that you had seen at the secondary

20  inspection?

21  A    I did.  I did.

22  Q    What was that?

23  A    I asked Mr. McRae if I could look through his phone.

24  He had a cellular telephone.  As I was looking through it I

25  identified a name as I believe it was "TNIA", Tnia, and I

108

1    asked him if Tnia was Atonia Bailey, and if Atonia Bailey

2    was in Jamaica, and he said no.

3         MS. MARSTON:  Your Honor, may I approach?

4         THE COURT:  You may.

5    Q    I'm going to show you what's been marked for

6    identification purposes as Government's Exhibit 43A.  Do you

7    recognize Government's Exhibit 43A?

8    A    I do.

9    Q    How do you recognize it?

10   A    I recognize it as a cell phone that I seized from

11   Mr. McRae.

12   Q    I'm also going to show you what's been marked as

13   Government's Exhibit 43B.  Do you recognize Government's

14   Exhibit 43B?  Would you flip through it to make sure.

15   A    (Witness complies.)  I do.

16   Q    And how do you recognize this?

17   A    This document is the document which was -- which

18   returned to the court after I did a search warrant on this

19   telephone.

20   Q    And what does this document contain relating to the

21   defendant's cell phone, Government's Exhibit 43A?

22   A    It contains all the numbers that were in his contact

23   phone or his phone book, all recent calls to the phone and

24   from the phone and any type of text messages.

25        MS. MARSTON:  At this time the government moves

142

1    Q    All right.

2    A    Briefly.  When I started going through it, he consented

3    to me going through it.  And then he basically stopped that.

4    He stopped that consent and I didn't go through it anymore

5    until I got the search warrant, and I did go through it

6    under a search warrant.

7    Q    Okay.  Now, when you say that he consented to your

8    search, was Madison McRae's interview with you, was that

9    recorded on audiotape?

10   A    No, it wasn't.

11   Q    Was it recorded on videotape?

12   A    No, it wasn't.  His -- his -- this was during the

13   secondary process in which when he was secondary, you know,

14   he was being questioned as to the travel and whatnot, trying

15   to establish where he had been and what he was doing.

16   Q    Well, as far as the secondary process, was he pulled

17   out of line at this time?

18   A    He was in the line for secondary.  When you come to the

19   airport you go through primary.  And then once you get your

20   bags, you go through secondary customs.  Or you come to a

21   person, customs inspector, that looks at your initial

22   documents.  If there's no suspicion or they don't feel that

23   there's grounds for you to be looked at again, then they

24   send you on your way or you come over to secondary.

25   Q    Well, Agent Crum, this conversation involving the cell

1  phone took place in your office, didn't it?

2  A    It did.

3  Q    And at that time he wasn't free to go anywhere, was he?

4  A    No, not at that time.

5  Q    Okay.  Now, Agent Crum, are you familiar with Customs

6  Form 4612?  It's a statement of rights form?

7  A    Yes, I am.

8  Q    Okay.  That's a standardized form that you in Customs

9  use when you are questioning an individual or a suspect.

10  Isn't that right?

11  A    No, sir, it's not.

12  Q    What's it used for?

13  A    When we're going to place somebody under arrest.  It's

14  the Miranda warning we give them.  But Mr. McRae wasn't

15  under arrest at the time.

16  Q    You never gave Mr. McRae that standardized form to

17  waive his right, did you?

18  A    No, sir, I didn't.

19  Q    And isn't it also true, Agent Crum, that this

20  conversation regarding Mr. Ray's cell phone, that took place

21  at around 8 p.m. or 8:30?

22  A    I don't know.

23  Q    You're not sure.  Okay.  Wasn't it also at the same

24  time that you faxed a photo of Mr. McRae to Charlotte?

25  A    I know it was probably within the same time frame.

1    regarding statements that Mr. McRae allegedly made and that

2    those comments, Your Honor, Mr. McRae's contention is that

3    they were never made.  So we ask to be able to voir dire

4    Agent Mensinger with regards to that because there's no

5    corroborating evidence to support those comments.

6           THE COURT:  On that basis, have comments of the

7    defendant previously been provided to counsel?

8           MS. MARSTON:  Yes.  The report has previously been

9    provided.  It was the report I was using when I was

10   cross-examining the defendant.

11          THE COURT:  The basis for your request to voir

12   dire is that there's no independent corroboration.

13          MR. McKNIGHT:  That is correct, Your Honor.

14   There's no independent corroboration of any of these

15   comments that we believe that the government is going to try

16   to solicit from Agent Mensinger.  And we would ask for an

17   opportunity to voir dire him, and also get to the bottom of

18   this whether or not any of his rights were violated.  In

19   particular, we know that he was probably being detained at

20   this time, but he was not given his Miranda rights.

21          THE COURT:  Have you filed a motion to suppress

22   that?

23          MR. McKNIGHT:  Well, no, Your Honor, I didn't file

24   a motion to suppress because the suppression motion would

25   have been difficult to draft in the sense my client says he

548

1  never made the comments in the first place, which means, you

2  know, it's hard to -- hard to argue a suppression for

3  comments that were allegedly never made.

4         THE COURT:  I'm going to deny your motion for voir

5  dire.  I'm going to require, before you ask him anything

6  that the defendant said to him, that you lay a foundation

7  that includes sufficient information for the Court to

8  determine whether there's any --

9         MS. MARSTON:  Yes, Your Honor.

10         THE COURT:  -- violation of rights.

11         MR. McKNIGHT:  Your Honor, I respectfully object

12  and ask it be noted for the record.

13         THE COURT:  So noted.

14         (Sidebar concludes.)

15  **BY MS. MARSTON**

16  Q    Sir, after you told the defendant you were in charge,

17  what happened next?

18  A    He asked me what kind of trouble he was in.

19  Q    And how did you respond to that?

20  A    I informed him he was under arrest.  He was kind of

21  asking about his status.  And he was informed that he would

22  be brought to the U. S. magistrate the following day for a

23  bond hearing.

24  Q    Now, did you advise him of his rights with an official

25  Miranda form?

1   A    No, I did not.

2   Q    How did you go about advising him of his rights?

3   A    After he -- the defendant asked what he could do to

4   help himself.  I asked him if he was advised of his rights,

5   to which he stated, "Yeah, I know my rights."

6   Q    After the defendant told you that he knew his rights,

7   what did you do?

8   A    I told him he was under -- this was in response to him

9   again asking what he could do to help himself.  I stated

10  that any cooperation he provided would be brought to the

11  attention of the federal prosecutor, may also be relayed to

12  the U. S. magistrate who determines whether he'll be

13  detained or released.  I also stated he was under no

14  obligation to speak with agents at all without an attorney

15  present.

16  Q    Did you tell him that an attorney would be given to him

17  if he wants one?

18  A    Yes.  He kept saying, "What do I need to do?  How do I

19  help myself?"  And my advice to him was if you want to

20  cooperate, I can go get the case agent, which would be

21  Agent Crum, and meaning he could be interviewed.

22       I advised him if he wanted to cooperate, to cooperate

23  fully.  If he was going to lie and tell half truths, that

24  he's better off just remaining silent and getting an

25  attorney later on in the process.

551

1   about the bungalow where he was staying in Jamaica.  He was

2   talking about the girls.  And he basically was talking about

3   that -- I'm trying to remember the first name, but it was a

4   Ms. Bailey.  And he was talking he felt that Ms. Bailey was

5   blaming him, and that he hasn't seen Ms. Bailey for several

6   weeks.

7   Q    Did he admit Ms. Bailey had been on the trip with him?

8   A    No.  He said he hasn't seen her in several weeks.  And

9   the only girls he was hanging out with in Jamaica were

10  actually Jamaican national females.  There weren't any

11  American women with him.

12  Q    After you started talking about the bungalow, what did

13  he tell you?

14  A    Then he stated that it was Mr. Green that was involved

15  with the cocaine and the girls, kept referring to them as

16  "the girls."  He stated he saw two kilos of cocaine in the

17  bungalow.  He stated he knew that it was cocaine because it

18  was white powder, it was wrapped in plastic and in brick

19  form.

20  Q    And did he mention anything else about the cocaine and

21  how it got on the girl's bodies?

22  A    Yes.  He changed his story several times about how --

23  he described this bungalow in great detail, which was rather

24  confusing, but he was talking about how Mr. Green would take

25  one of the girls out of the bungalow, strap the cocaine.

1    And then it became Mr. Green took several girls out, and

2    basically there was a lot of inconsistencies in his story.

3    But basically he said that his fingerprints wouldn't be on

4    any of the cocaine, and that Mr. Green was the one that

5    strapped the cocaine to the girl's legs.

6    Q    Had there been any information provide to the defendant

7    about strapping cocaine?

8    A    Not from me, no, ma'am.

9    Q    Well, what did he say about how everybody got to the

10   airport?

11   A    He stated that the girls -- later he recanted the story

12   and stated that I believe Ms. Bailey was with him in

13   Jamaica.  And he referred to the three girls took a cab to

14   the airport in Jamaica, I believe Montego Bay, and himself

15   and Mr. Green took a separate vehicle or cab to the airport.

16   Q    What happened after that information that he provided

17   to you?

18   A    There was some more conversation about -- again the

19   girls.  He was changing up his story a little bit as far the

20   girls.  How many there were.  And at that point I'm trying

21   to recall where in the conversation we are.

22   Q    Did you talk to him at all about clearing Customs?

23   A    Yes, I did.

24   Q    And what did he tell you about that?

25   A    I asked Mr. McRae if Mr. Green gave him any

1  instructions on when he landed into Memphis, how he would

2  clear Customs.  And he stated that Mr. Green was friends

3  with a female Customs agent at the Memphis International

4  Airport and he pretty much gets right through because she's

5  already verified his legitimate income, so to speak, I think

6  for grass cutting.  So they basically thought Mr. Green was

7  legitimate, and that way that enabled both Mr. McRae and

8  Mr. Green to easily slide through Customs in Memphis.

9  Q     And after that, did your involvement in this

10 investigation basically come to a conclusion?

11 A     Yes.

12         MS. MARSTON:  Nothing further.

13         THE COURT:  Any cross.

14         MR. McKNIGHT:  Yes, Your Honor.

15                    **CROSS EXAMINATION**

16 **BY MR. McKNIGHT**

17 Q    Now, Agent Mensinger, you testified earlier that you

18 placed Mr. McRae under arrest.

19 A     I advised him he was under arrest.  That is correct.

20 Q     And you testified earlier you made the comment has he

21 been advised of his rights, and he responded, "Yeah, I know

22 my rights?

23 A     That's correct.

24 Q     And you didn't give him the litany of what his actual

25 Miranda rights were, did you?

1    purpose.  He wanted to make more of a profit than he was

2    selling when Rodney Green gave him cocaine in the United

3    States, and the way to do that was get to Jamaica.  The

4    United States has proven Count One beyond a reasonable

5    doubt.

6         Count Two the defendant knowingly possessed, or

7    aided and abetted the possession of a controlled substance,

8    and that that substance was, in fact, cocaine.  That the

9    defendant possessed or aid and abetted the possession of the

10   substance with the intent to distribute, and that the

11   defendant acted unlawfully, knowingly and intentionally.

12        This particular count deals with August 24th,

13   2004, and it deals with the drugs that you have seen on this

14   table.  It deals with the fact that the defendant and Rodney

15   Green made the girls bring the drugs back for them.  The

16   defendant purposely scheduled the girls' trip on a different

17   day.  He purposely scheduled the girls' trip to go through a

18   different connecting city.  The defendant did not want to be

19   anywhere near the girls and the cocaine.  It was done on

20   purpose.  Because then when the defendant gets stopped in

21   Memphis, he can go ahead and say, "I don't know

22   Atonia Bailey.  The last time I've seen her was a few weeks

23   ago," which is exactly what he did when Agent Crum asked

24   him, "Who is TNIA in his contacts."  The defendant was

25   distancing himself from the drugs in case anything happened.

1   controlled substances, that is a quantity of cocaine and/or

2   Ecstasy, we, the jury, find -- again, the United States

3   believes that you will mark guilty there based on the

4   testimony that you have heard and the evidence that you have

5   seen.

6          And then you move on to 3A and it's exactly the

7   same as that first count.  You, the jury, decide whether or

8   not during the course of the conspiracy it involved in

9   excess of five kilograms.

10         And then you move to Count Four, charging the

11  defendant, Madison Duane McRae, with knowingly and

12  intentionally importing into the Customs territory of United

13  State, and into the United States from a place outside

14  thereof, a quantity of cocaine, or aiding and abetting in

15  that offense.  Again, that last count, the evidence that you

16  have heard, the testimony from each witness proves beyond a

17  reasonable doubt that on August 24th, 2004,

18  Madison Duane McRae, the defendant, knew exactly what was

19  happening in Charlotte, North Carolina.

20         That's why he first said he didn't know a TNIA,

21  know Atonia Bailey.  That's why he told Agent Crum he hadn't

22  seen Atonia Bailey for a few weeks.  That's why he said he

23  only hung out with Jamaican women.  He wanted to put himself

24  as far away.  He wanted to have nothing to do with it.

25         August 24th; September 13th, 2005, the defendant

632

1    returned on January 25th, 2005, there were 23 grand jurors

2    concurring.

3           And then the Superseding Bill of Indictment, which

4    was returned on February 28th, 2005, there were 21 grand

5    jurors concurring.  And I'm going to make a record of grand

6    jurors concurring part of the record in this case.  So,

7    Madam Clerk, if you would record those.

8           The second matter, at sidebar yesterday defense

9    counsel requested an opportunity to voir dire the witness --

10   I forgot exactly who that was.

11          MR. McKNIGHT:  I do believe that was Agent

12   Mensinger, Your Honor.

13          THE COURT:  Mensinger.

14          MS. MARSTON:  That's correct, Your Honor.

15          THE COURT:  Robert Mensinger.

16          MS. MARSTON:  Yes, Your Honor.

17          THE COURT:  And the Court denied that request

18   after asking counsel whether a motion to suppress had been

19   filed, and there had been no prefiled motion to suppress

20   filed as is required by Rule 12(b)(c), and I take that -- I

21   find that that's a waiver of a suppression hearing, the

22   failure to file a pretrial motion.  But, alternatively, as

23   well, I listened to the testimony -- before the testimony

24   required the prosecutor to lay a foundation before she asked

25   the agent about any statements made by the defendant, and I

13-6878

## CERTIFICATE OF SERVICE
*******************************

I certify that on June 17, 2013, I served a copy of this informal brief on all parties, addressed as shown below.

*Madison McRae* 6-17-2013
**MADISON MCRAE**

KAREN S. MARSTON
OFFICE OF THE UNITED STATES ATTORNEY
CARRILLON BUILDING
227 W. TRADE ST. SUITE 1700
CHARLOTTE, N.C. 28202-0000

AMY ELIZABETH RAY
OFFICE OF THE UNITED STATES ATTORNEY
UNITED STATES COURTHOUSE
100 OTIS STREET. ROOM 233
ASHEVILLE, N.C. 28801-0000

RECEIVED 2013 JUN 24 AM 10: 05 U.S. COURT OF APPEALS FOURTH CIRCUIT

Maurin Prince 19852-076
Federal Correctional Institution
P.O. 6001
Ashland, Ky 41105

RECEIVED
JUN 17 2013
BY:

⇔19852-076⇔
Court Of Appeals
1100 E.Main ST, Suite 501
Richmond, VA 23219
United States

INSPECTED

JUN 24 2013

USPS
JUN 18
Ashland KY 41101

Ashland KY 4

Ashland KY

Liberty FOREVER

Equality FOREVER

Justice FOREVER

Equality FOREVER

Freedom FOREVER

Justice FOREVER

USA FIRST-CLASS FOREVER

USA FIRST-CLASS FOREVER

USA FIRST-CLASS FOREVER

USA FIRST-CLASS FOREVER

USA 44